**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

STATE OF WEST VIRGINIA, *ex rel.* JOHN B. MCCUSKEY, Attorney General,

*Plaintiff,*

v.

NEW JERSEY BOARD OF PUBLIC UTILITIES; BEN HERTZ-SHARGEL, in his official capacity as President of the New Jersey Board of Public Utilities; and CHRISTINE GUHL-SADOVY, MICHAEL BANGE, JOSEPH COVIELLO, and EMMA REBHORN, in their official capacities as Commissioners of the New Jersey Board of Public Utilities,

*Defendants.*

Civil Action No. _________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

The State of West Virginia, *ex rel.* John B. McCuskey, Attorney General—located at 1900 Kanawha Blvd., East Building 1, Room E-26, Charleston, WV 25305—brings this action against the New Jersey Board of Public Utilities ("Board" or "BPU") and BPU officials—located at 44 So. Clinton Ave., 7th Floor, Trenton, NJ 08625. The BPU and its officials are responsible for implementing and enforcing New Jersey's solar renewable energy credit programs: the Solar Renewable Energy Certificate ("SREC") program, the Transition Renewable Energy

Certificate ("TREC") program, and the Successor Solar Incentive ("SuSI") program (also known as "SREC-II"). The State seeks declaratory and injunctive relief to vindicate its own rights and those of its energy producers, ratepayers, and citizens under the Commerce Clause of the United States Constitution.

## BACKGROUND

1. New Jersey requires electric power suppliers to procure a minimum percentage of their electricity from qualifying renewable sources. A supplier can satisfy these renewable portfolio standards ("RPS") in one of three ways: it can buy renewable power directly; it can buy the cheapest wholesale power available (e.g., coal or gas) and separately purchase renewable energy "credits" from a renewable generator; or it can pay a penalty fee.

2. This lawsuit concerns the second and most common method of RPS compliance—purchasing renewable energy credits—and, specifically, New Jersey's regulation of the market for solar credits.

3. Although New Jersey requires its electricity suppliers to obtain a large (and increasing) percentage of their electricity from solar, it bars out-of-state solar generators from selling credits into New Jersey.

4. Each of New Jersey's three solar programs since 2004 has accomplished this by requiring physical connection to New Jersey's distribution or transmission system—even though New Jersey participates in an interstate electricity grid through which its suppliers could readily purchase solar credits from generators in West Virginia, eleven other States, and the District of Columbia. For every other type of renewable energy credit, New Jersey allows out-of-state sales. Only solar is walled off.

5. New Jersey's solar programs serve no legitimate environmental purpose, nor do they advance the welfare of New Jersey's citizens.

6. To the contrary, these programs were designed to create an in-state solar carve-out to benefit New Jersey industries.

7. The BPU has described its solar incentive regime as "establishing carve-outs for *in-state* solar."[1] The BPU has also admitted that allowing interstate competition in the energy credit market results

---

[1] *See* N.J. Bd. Pub. Utils., *2019 N.J. Energy Master Plan* 101 (2019), https://tinyurl.com/4vvk2n3e.

in "lower ratepayer cost," but it noted that such credits resulted in "fewer economic benefits . . . directly to New Jersey."[2]

8. Senator Bob Smith, the sponsor of the bill that created the current iteration of New Jersey's solar credit program, expressly rejected the proposal to open up trading to interstate competition, stating that the legislature's "direction from the top, from the Governor's office" was that it was "better to have jobs created in the state of New Jersey."[3]

9. West Virginia and New Jersey are both part of PJM Interconnection, L.L.C. ("PJM"), a regional transmission organization through which wholesale electricity flows across state lines. PJM also creates and tracks a digital certificate for each megawatt-hour ("MWh") of energy produced, and those certificates can be traded as credits on an open market, separately from the energy itself.

10. Accordingly, many West Virginia energy producers could easily sell solar credits to New Jersey electricity suppliers—and they would, but for New Jersey's protectionist law.

---

[2] *2019 N.J. Energy Master Plan*, *supra* note 1, at 104.

[3] *Hearing on S. 2605 Before the S. Env't & Energy Comm.*, 219th Leg. (N.J. May 11, 2021), at 2:04:24–2:04:39 (statement of Sen. Bob Smith), https://tinyurl.com/3u9p4pty.

11. Under New Jersey's protectionist solar programs, solar credits trade within the State at roughly $81 to about $200 per MWh. West Virginia produced roughly 313,000 MWh of solar energy in 2025, and that number is growing. The harm to West Virginia from being shut out of this market is therefore substantial.

12. Using conservative assumptions, New Jersey's protectionist scheme bars West Virginia's new solar projects from competing in annual auctions whose awards are worth hundreds of millions of dollars over their fifteen-year terms. But as New Jersey shuts out competition from out of state, its own bidders have filled only about half of the capacity the State has sought at prices it was willing to pay. So, even assuming that West Virginia generators would be able to capture only that roughly 50% shortfall in supply, they are still missing out on millions in possible credit sales.

13. Specifically, West Virginia generators will miss out on approximately $140 million to $152 million in net revenue under New Jersey's successor solar program between 2027 and 2031, estimated by multiplying New Jersey's average unmet demand by the net value of each credit. Separately, three West Virginia solar plants that New Jersey

barred from bidding while they were under development could have earned as much as $128 million to $138 million from 2027 through 2031 if admitted. And West Virginia systems that would have qualified for New Jersey's original SREC program—which closed to new applicants in 2020 but still requires suppliers to buy credits from registered facilities—will lose out on the opportunity to earn more than $6 million through 2033, on top of about $20 to $22 million already missed from 2018 through 2025.

14. These lost revenues harm West Virginia, because the sales would flow back to the State and its citizens. Of the new-project revenue alone, approximately $6.4 million to $7 million would go to the State treasury in income taxes. And New Jersey's exclusion forecloses revenue that would lower the costs borne by West Virginia electric customers.

15. New Jersey's own ratepayers also pay the price. New Jersey utilities pass the cost of every solar credit through to their customers, and by shutting out competition from the rest of PJM, New Jersey forces its residents to pay award prices ranging from $81.45 to $135 per credit in the most recent Competitive Solar Incentive ("CSI") solicitation, and roughly $200 per credit for the legacy SRECs that suppliers must keep

buying through 2033, amid what the State itself calls an "electricity affordability crisis."[4]

16. The Framers included the Commerce Clause in our Constitution precisely to prevent this kind of naked economic warfare between states. *See* U.S. Const. art. I, § 8, cl. 3. As courts have long recognized, the Clause prevents states from erecting barriers at their borders to shield in-state producers from the rigors of interstate competition. Yet New Jersey did precisely that.

17. West Virginia brings this action—along with other pending suits against similar laws, *see West Virginia ex rel. McCuskey v. Pennsylvania Pub. Util. Comm'n*, No. 3:26-cv-02527 (M.D. Pa. filed Sept. 3, 2026)—to tear down New Jersey's unconstitutional trade barriers and restore the interstate market that the Constitution and federal energy policy were designed to create.

[4] *See* N.J. Bd. Pub. Utils., *Order on the Outcome of the Fourth Solicitation in the CSI Program*, Dkt. No. QO21101186, at 4 (June 30, 2026) ("*Fourth Solicitation Order*"), https://tinyurl.com/y2utrpz8; N.J. Bd. Pub. Utils., *EY 24 RPS Compliance Results 2004 to 2024* (legacy SREC weighted average price of $206.98 in energy year 2024), https://tinyurl.com/2tzm574s.

## PUBLIC INTEREST

18. The Attorney General believes this action is in the public interest of West Virginia citizens and brings this lawsuit by his constitutional and statutory authority, powers, and duties.

19. West Virginia ratepayers are directly harmed by New Jersey's border-closing programs. West Virginia is a fully regulated, vertically integrated electricity market. Its major utilities—Appalachian Power, Mon Power, and Potomac Edison—hold renewable energy credits on behalf of ratepayers and pass value directly to families through cost-of-service ratemaking. When West Virginia generators are blocked from selling credits into New Jersey, it is West Virginia families who lose.

20. West Virginia's growing solar industry, developing under Senate Bill 583, is also stunted by New Jersey's unconstitutional trade barriers. Affected West Virginia generators include Berkshire Hathaway Energy (Ravenswood solar facility), Horus WV 1 LLC/Blake (Opdenergy/Antin solar), rooftop and distributed solar owners, and other utility-scale solar developers entering the market under SB 583. All are harmed by their exclusion from New Jersey's solar credit markets.

## PARTIES

21. The State of West Virginia, by and through its Attorney General, brings this action in its sovereign capacity as *parens patriae* on behalf of its citizens, as well as in its own economic interest based on the loss of specific tax revenue. The Attorney General is the Chief Legal Officer of the State of West Virginia, charged with protecting the State, its general economy, and its residents from unlawful interference with interstate commerce. *See* W. VA. CODE § 5-3-2.

22. Defendant New Jersey Board of Public Utilities is an agency of the State of New Jersey charged with administering, implementing, and enforcing New Jersey's Renewable Portfolio Standards and solar incentive programs. *See* N.J. STAT. ANN. §§ 48:2-13, 48:3-49, 48:3-87 *et seq*. The BPU has adopted regulations implementing the SREC program (N.J. ADMIN. CODE § 14:8-2.1 *et seq.*), the TREC program (N.J. ADMIN. CODE § 14:8-10.1 *et seq.*), and the SuSI program (N.J. ADMIN. CODE § 14:8-11.1 *et seq.*). Those regulations are the agency action through which the challenged geographic eligibility restrictions are applied to New Jersey's solar energy credit markets.

23. Defendant Ben Hertz-Shargel is the President of the New Jersey Board of Public Utilities. Defendants Christine Guhl-Sadovy, Michael Bange, Joseph Coviello, and Emma Rebhorn are Commissioners of the New Jersey Board of Public Utilities. Each is sued in his or her official capacity for prospective declaratory and injunctive relief. As BPU officials, they participate in, supervise, and are responsible for the ongoing implementation, administration, and enforcement of the challenged programs and regulations.

**JURISDICTION AND VENUE**

24. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution of the United States, specifically Article I, Section 8, Clause 3 (the Commerce Clause).

25. Defendants are subject to suit for prospective relief under *Ex parte Young*, 209 U.S. 123 (1908), and the Court has traditional equitable authority to grant such relief. The Court may award declaratory relief under 28 U.S.C. § 2201(a) and further necessary or proper relief, including injunctive relief, under 28 U.S.C. § 2202.

26. Plaintiff seeks declaratory and injunctive relief to stop ongoing violations of the U.S. Constitution. The individual defendants

are sued in their official capacities because they are charged with administering and enforcing the challenged statutory and regulatory restrictions.

27. Venue is proper in the District of New Jersey under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants operate and administer the challenged laws in this District, and a substantial part of the events giving rise to this action occurred here.

## FACTS

### A. The PJM Interconnection and the Federal Policy of Non-Discriminatory Wholesale Competition

28. PJM operates the electric transmission system—the "grid"—for all or part of thirteen states[5] and the District of Columbia. PJM centrally dispatches generation and coordinates the movement of wholesale electricity across this vast, interconnected, multi-state region.[6]

29. Wholesale energy in PJM is interstate commerce because of the interconnected grid across numerous state lines. *See New York v.*

[5] Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia.

[6] *See About PJM*, PJM INTERCONNECTION, L.L.C., https://tinyurl.com/5edm6m8r (last visited Nov. 8, 2026); *see also PJM*, FERC (last updated Oct. 15, 2026), https://tinyurl.com/y47fjwru.

*FERC*, 535 U.S. 1, 7 (2002) (in all but three states, "any electricity that enters the grid immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce"); *see also FPC v. Fla. Power & Light Co.*, 404 U.S. 453, 458 (1972).

30. PJM was founded in 1927 as a power pool of three utilities serving customers in Pennsylvania and New Jersey.[7] Over time, its footprint expanded to include utilities across thirteen states, including West Virginia, and the District of Columbia.[8]

31. PJM's creation as an independent system operator ("ISO") and later Regional Transmission Organization ("RTO") was a direct result of federal policy mandating non-discriminatory access to wholesale electricity markets. In 1996, the Federal Energy Regulatory Commission ("FERC") issued Order No. 888, titled "Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities." FERC's goal was "to remove impediments to

---

[7] *PJM*, FERC (last updated Oct. 15, 2026), https://tinyurl.com/3zwr6yve.

[8] *Territory Served*, PJM INTERCONNECTION, L.L.C., https://tinyurl.com/rtbs9fxr (last visited Nov. 13, 2026).

competition in the wholesale bulk power marketplace and to bring more efficient, lower cost power to the Nation's electricity consumers."[9]

32. Order No. 888 required utilities that own interstate transmission lines to let competing power producers use those lines on the same terms the utilities gave themselves. In other words, a utility could no longer favor its own power plants by blocking or overcharging rivals for access to the grid. FERC also encouraged the creation of independent system operators to run the grid neutrally, so that everyone using it—power producers selling electricity and the utilities and other buyers purchasing it—would receive "fair and non-discriminatory access," "independent of any individual market participant or any one class of participants."[10]

33. Congress "empowered and directed" FERC to "divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy." 16 U.S.C. § 824a(a). Acting on that authority, in 1999,

---

[9] *Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities*, Order No. 888, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996), FERC Stats. & Regs. ¶ 31,036 (1996).

[10] Order No. 888, 61 Fed. Reg. at 21,596.

FERC issued Order No. 2000, which encouraged the formation of RTOs to promote broader regional transmission planning, energy trading, and coordination. *See Regional Transmission Organizations*, Order No. 2000, 65 Fed. Reg. 809, 825 (Jan. 6, 2000), FERC Stats. & Regs. ¶ 31,089 (1999). RTOs are non-profit entities designed to ensure non-discriminatory access to the grid, so that sellers and buyers of wholesale electricity can connect with ease and achieve competitive, fair, market-based prices. PJM became an RTO under this federal framework.

34. The federal policy underlying these orders is unambiguously meant to prevent states from balkanizing the interstate wholesale electricity market. FERC's regulations were designed to ensure that no transmission owner—and no state—could give preferential treatment to in-state generators at the expense of out-of-state competitors. *See* Order No. 888, 61 Fed. Reg. at 21,541 ("The legal and policy cornerstone of these rules is to remedy undue discrimination in access to the monopoly owned transmission wires that control whether and to whom electricity can be transported in interstate commerce."); Order No. 2000, 65 Fed. Reg. at 825 (RTOs remedy "the continuing opportunity for undue discrimination").

35. As discussed below, New Jersey's laws do exactly what a quarter-century of federal energy policy was designed to prevent. They partition the integrated PJM market along state lines, rewarding in-state companies based on geography alone rather than on economic efficiency or putative environmental benefit.

### B. Renewable Energy and Solar Renewable Energy Credit Sales in the PJM Region

36. Within the PJM system, renewable energy credits ("RECs") function as tradable certificates that track and verify the generation of electricity from qualifying renewable energy sources. A REC is issued for every MWh of electricity generated and delivered to the grid from an eligible energy resource. Each certificate is assigned a unique serial number and represents the legal property right to the renewable energy attributes of that generation.[11]

37. RECs are tracked through PJM's Generation Attribute Tracking System ("GATS"), a centralized electronic platform that creates, records, and tracks certificates as they are generated and traded.[12] GATS

[11] *About GATS*, PJM-EIS, https://tinyurl.com/3barfdkp (last visited Nov. 13, 2026).

[12] *Id.*

ensures that credits are not double-counted and provides state regulators with access to centralized reporting.

38. Credits can be traded independently from the actual energy to which they are linked. That is, when a generator produces an MWh of electricity, the credit that is assigned to that unit of energy can be bought and sold separately, and utilities can purchase it—again, independent of actual power—to satisfy their state renewable portfolio standard obligations.[13] Once used for that purpose, the credit is "retired," so it cannot be double-counted.

39. This RTO system was designed to harness the efficiencies of interstate commerce. Renewable energy generated in West Virginia and delivered over the PJM grid creates the same environmental benefit as if it were produced by a generator in New Jersey.[14] The credit itself represents the public benefit and is fungible across state lines.

---

[13] *Generation Attribute Tracking System,* PJM INTERCONNECTION, L.L.C. (Sept. 26, 2025), https://tinyurl.com/2fhw83z4.

[14] *See GATS Operating Rules*, PJM-EIS 42 (Jan. 26, 2024), https://tinyurl.com/jh4fvuud (certificates created and tracked within GATS "represent all of the Attributes from one MWh of generation").

### C. New Jersey Created an Energy Credit Market but Walled Off Solar Energy from Interstate Competition

40. In 1999, the New Jersey Legislature enacted its Electric Discount and Energy Competition Act, which established the State's RPS. *See* P.L. 1999, c. 23 (codified as amended at N.J. STAT. ANN. § 48:3-49 *et seq.*). The RPS requires electric power suppliers and basic generation service providers to procure minimum percentages of electricity from qualifying renewable sources. *See* N.J. STAT. ANN. § 48:3-87(d).

41. The RPS divides qualifying resources into three categories: Solar RECs ("SRECs"), Class I RECs (wind, fuel cells, geothermal, wave, tidal, methane gas, biomass, and certain other resources), and Class II RECs (hydropower that is not pumped storage and resource recovery facilities). *See* N.J. STAT. ANN. § 48:3-51.

42. For Class I and Class II RECs, New Jersey has always allowed and currently allows credits from energy "generated within or delivered into the PJM region." N.J. ADMIN. CODE § 14:8-2.7(b). This language expressly opens the Class I and Class II credit markets to generators in D.C. and any of the thirteen PJM states, including West Virginia.

43. But the RPS treated solar differently. New Jersey required solar generators to be *physically connected* to New Jersey's distribution system to sell SRECs that could be used for RPS compliance. *See* N.J. ADMIN. CODE §§ 14:8-2.2, 14:8-2.9(e)(1). To be "connected to the distribution system in New Jersey," N.J. ADMIN. CODE § 14:8-2.2, a generator must—among other requirements—be connected to a distribution system "owned or operated by an electric public utility and approved by the [BPU]" under New Jersey law. N.J. STAT. ANN. § 48:3-51 (defining "connected to the distribution system"). Because out-of-state distribution systems are not subject to BPU approval, out-of-state generators cannot be "connected to the distribution system in New Jersey" and cannot sell SRECs in-state.

44. This restriction has no parallel in the Class I or Class II REC programs. Accordingly, New Jersey's own RPS compliance regime shows that it is both possible and workable to open credit markets to interstate competition across PJM. But for solar, New Jersey has chosen to close the market, solely to benefit and protect in-state solar companies.

### D. New Jersey's Three Solar Incentive Programs Each Require In-State Presence, Making Interstate Competition Impossible

45. New Jersey has had three solar credit programs since the enactment of its RPS compliance regime. Not one of the programs has permitted out-of-state solar credit sales.

46. **The SREC Program.** New Jersey's original SREC program grew out of the RPS established by the Electric Discount and Energy Competition Act. In 2004, the BPU introduced an explicit solar set-aside within the RPS.[15]

47. Under the program, each SREC represents the environmental attributes of one MWh of solar electricity, and electricity suppliers serving New Jersey customers must either purchase and retire sufficient SRECs to meet the solar RPS or pay a Solar Alternative Compliance Payment.[16]

48. Critically, the program required solar facilities that sold energy or credits to electricity suppliers to be "connected to the

---

[15] *See* N.J. Div. of Rate Counsel, *Comments on 2015 Energy Master Plan Update* 8 (Aug. 24, 2015), https://tinyurl.com/nwkrjeap.

[16] *See* N.J. Bd. Pub. Utils. & N.J. Dep't of Env't Prot., *New Jersey Energy Master Plan: Update* 14–15 (Dec. 2015), https://tinyurl.com/3a4r5tnp.

distribution system in New Jersey" to qualify to produce SRECs. N.J. ADMIN. CODE § 14:8-2.2; § 14:8-2.9(e)(1). A solar facility located in West Virginia cannot satisfy the "connected to the distribution system in New Jersey" requirement, *see* N.J. STAT. ANN. § 48:3-51, even though the West Virginia facility delivers electricity onto the same PJM grid and produces the same environmental attributes.

49. This program was closed to new applicants in April 2020, but existing qualified facilities continue to produce SRECs that electricity suppliers must purchase to satisfy the solar RPS obligation. Because only facilities connected to New Jersey's distribution system qualify, all qualified facilities are located in New Jersey.[17]

50. **The TREC Program.** When the SREC program closed to new applicants in April 2020, New Jersey implemented the TREC program as an interim measure. TRECs carried substantially the same geographic eligibility requirements as SRECs, i.e., requiring connection

[17] *2015 N.J. Energy Master Plan Update*, *supra* note 16 at 13 ("[S]olar and small scale hydropower facilities must be connected to the New Jersey distribution system in order to generate RECs for compliance with the RPS."); *id.* at 19 ("To qualify for SRECs, all New Jersey solar must be connected to the distribution system.").

to New Jersey's distribution system. *See* N.J. ADMIN. CODE § 14:8-10.3(b)-(c).

51. Under the TREC program, utilities procured TRECs through a centralized administrator at a fixed price set by the BPU. The program closed in August 2021, but existing TREC-qualified facilities continue to generate credits. Like the SREC program, the TREC program excluded every out-of-state solar generator. *See id.*

52. **The SuSI/SREC-II Program.** New Jersey's current and most expansive solar incentive program is the Successor Solar Incentive program, also known as SREC-II, which took effect on August 28, 2021. SuSI replaced the TREC program. It provides one SREC-II for every MWh of solar electricity produced by a qualifying facility, and it established two incentive tracks, both of which impose geographic restrictions that exclude out-of-state generators.[18]

53. The first track, the Administratively Determined Incentive ("ADI"), applies to net-metered residential projects, net-metered non-residential projects of 5 MW or less, and community solar projects.

---

[18] *See* Press Release, N.J. Bd. Pub. Utils., *NJBPU Approves 3,750 MW Successor Solar Incentive Program* (July 28, 2021), https://tinyurl.com/yvsvjb2x.

Rather than requiring bids, the BPU sets a fixed incentive value for each market segment—originally ranging from $70 to $120 per SREC-II depending on project type and size—that is guaranteed for 15 years.[19] The BPU allocates annual megawatt capacity blocks to each market segment, and registration is first-come, first-served until the block fills or the energy year ends.

54. To qualify, again, a facility "must be connected to the distribution or transmission system owned or operated by a New Jersey electric distribution company" or "by a New Jersey municipal electric utility." N.J. ADMIN. CODE § 14:8-11.4(e).

55. The second track, the CSI, applies to larger solar generators—grid-supply projects and net-metered non-residential projects larger than 5 MW—and only prospective projects. Unlike the ADI track, CSI does not set a price in advance. Instead, the BPU holds periodic competitive solicitations, generally once a year, in which generators bid for the right to sell their credits.[20]

---

[19] *See id.*

[20] *See Fourth Solicitation Order*, *supra* note 4, at 2.

56. The BPU aims to award incentives for about 300 MW of new solar capacity each year. It divides that target among separate tranches by project type and sets a confidential price cap for each tranche. Each developer submits a single sealed bid stating the price per credit it is willing to accept. The BPU then ranks the bids, rejects any that exceed its price cap, and approves the winning projects. Each winner is paid its bid price for every credit its facility generates over a 15-year qualification life.[21]

57. To qualify for this track, a facility "must plan to be interconnected to a distribution or transmission system operated by a New Jersey electric public utility or local government unit." N.J. ADMIN. CODE § 14:8-11.4(k).

58. In addition, the authorizing statute provides that the BPU "shall not authorize a grid supply solar facility . . . to commence operation, or to interconnect to an electric distribution or transmission system, unless it meets" specific siting criteria. N.J. STAT. ANN. § 48:3-119(a). Since the Board cannot "authorize" an out-of-state facility's operations or its connection to the grid, this provision further ensures that only

[21] *See Fourth Solicitation Order*, *supra* note 4, at 2–3, 9.

facilities physically located in New Jersey can participate in the SuSI program.

59. In sum, SREC established the in-state-only framework, TREC carried it forward during a transition period, and SuSI perpetuated and expanded it.

60. The combined effect is an unconstitutional wall around New Jersey for the sale of SRECs. Out-of-state generators cannot be "connected to the distribution system in New Jersey." Accordingly, every solar facility that is not physically connected to New Jersey's distribution or transmission infrastructure is excluded, even those within the PJM Interconnection. A solar facility in West Virginia cannot participate in the solar credit market. The exclusion is absolute.

**E. New Jersey's Solar Credit Program Was Specifically Intended to Promote In-State Industry at the Expense of Interstate Competition**

61. New Jersey's own official documents evidence a protectionist purpose behind its solar credit geographic restrictions.

62. The BPU has described the SREC program as part of an "in-state solar carve-out."[22] It further described SuSI as "establishing carve-outs for in-state solar and offshore wind through 2035."[23]

63. The term "carve-out" denotes a portion set aside from the otherwise open credit market and, therefore, a deliberate policy of reserving a portion of the energy market for in-state producers to the exclusion of out-of-state competitors. And this differential treatment of solar credits highlights that the geographic restrictions serve no environmental purpose. If PJM-wide eligibility is adequate for Class I wind, biomass, and geothermal resources, it is equally adequate for solar resources that deliver identical clean energy onto the same grid.

64. The legislative record confirms that New Jersey limited SREC-II trading to in-state facilities to capture jobs for New Jersey, not to serve any environmental purpose.

65. On May 11, 2021, during the Senate Environment and Energy Committee's consideration of the legislation that became the Solar Act of 2021, the bill's sponsor, Senator Bob Smith, explained that the bill's

---

[22] *See* N.J. Bd. Pub. Utils., *2019 N.J. Energy Master Plan*, *supra* note 1, at 105.
[23] *Id.* at 101.

original language, which would have allowed interstate competition, created "a huge problem with labor and the industry," so the bill was "modified in such a way that this grid scale solar will be done in New Jersey" in order to keep "the benefits, namely the jobs and the renewable energy, closer to home."[24] At the same hearing, a witness testified that allowing utility companies to purchase out-of-state solar credits would save costs and produce "an order of magnitude more emissions reductions."[25] Senator Smith did not dispute this point; he responded: "We understand your point of view, but our direction from the top, from the Governor's office, was that . . . it was better to have jobs created in the state of New Jersey."[26] New Jersey thus considered a cheaper, nondiscriminatory alternative that would have cut more emissions and saved ratepayers money, but it rejected this option for the stated purpose of keeping solar jobs inside its borders.

---

[24] *Hearing on S. 2605 Before the S. Env't & Energy Comm.*, *supra* note 3, at 0:50:15–0:50:19, 0:50:31–0:50:35, 0:50:43–0:50:47 (statement of Sen. Bob Smith).

[25] *Hearing on S. 2605*, *supra* note 3, at 2:04:21–2:04:24 (statement of Barbara Blumenthal, New Jersey Conservation Foundation).

[26] *Id.* at 2:04:24–2:04:39 (statement of Sen. Bob Smith).

66. BPU officials have also repeatedly confirmed that a central goal of the SuSI program is to further in-state industries. When the BPU established the SuSI program in 2021, then-BPU President Joseph L. Fiordaliso declared that the program was "solidifying New Jersey as a magnet for green jobs" and ensuring "the solar industry will remain a vibrant part of our clean energy innovation economy."[27]

67. In March 2026, then-BPU President Christine Guhl-Sadovy likewise stated that the Board's actions advance the goal of "promoting clean, *in-state* energy resources."[28] And Governor Sherrill's Executive Order No. 2 directed the BPU "to rapidly expand in-state solar and battery storage." *Id.*

68. New Jersey has also long recognized that its solar geographic restrictions are successful in their exclusion of out-of-state competition. In 2015, the BPU and the New Jersey Department of Environmental Protection jointly reported that, while Class I and Class II RPS compliance came from both in-state and out-of-state sources—including

---

[27] Press Release, *supra* note 18.

[28] Press Release, N.J. Bd. Pub. Utils., *NJBPU Takes Major Action to Advance Governor Sherrill's Goals for Affordable, Clean Energy* (Mar. 5, 2026), https://tinyurl.com/2h844wvt (emphasis added).

West Virginia—"[a]ll of the solar renewable energy to meet the solar RPS was provided by in-state sources."[29] That outcome was the inevitable result of eligibility rules that require physical connection to New Jersey's distribution system.

69. The legislative findings accompanying the SuSI program reveal the same in-state focus. The Legislature found that "New Jersey has the market potential to host thousands of megawatts of solar power generation facilities." N.J. STAT. ANN. § 48:3-114(d). By enacting restrictive laws, New Jersey intended to capture solar development for itself.

70. The BPU has also considered petitions to amend New Jersey Administrative Code § 14:8-2.5 that would expand Class I REC eligibility to include out-of-state solar—another acknowledgment that the current rules improperly restrict eligibility based on geography.[30]

---

[29] *New Jersey Energy Master Plan: Update*, *supra* note 16, at 15.

[30] *See* N.J. Bd. Pub. Utils., *Minutes of May 20, 2020 Board Agenda Meeting* 26–27 (July 2020), https://tinyurl.com/yc2k7b3e; N.J. Bd. Pub. Utils., *Comments of Vitol, Inc., and VC Renewables, LLC I/M/O A Rulemaking Proceeding to Amend the Successor Solar Incentive Rules and the Renewable Portfolio Standard*, Dkt. No. QX25060355 (Apr. 20, 2026), https://tinyurl.com/2r33ruc7.

### F. West Virginia's Producers, Ratepayers, and Treasury Are Directly Harmed

71. In its June 2026 CSI solicitation, the BPU awarded average prices of $88.94 per MWh for projects of 20 MW or more and $105.74 per MWh for smaller projects.[31] New Jersey has therefore created a massive market available only to in-state generators, making in-state solar development artificially profitable for in-state producers while denying any share of that value to out-of-state competitors who produce identical benefits.

72. According to data from the U.S. Energy Information Administration, West Virginia's solar power capacity from its utility-scale generators in 2025 was 294 MW (direct current).[32] In total, these units generated about 233,000 MWh in 2025—the equivalent of 233,000 solar credits.[33] Adding small-scale solar systems, which generated about

---

[31] *See Fourth Solicitation Order*, *supra* note 4, at 7–8.

[32] U.S. Energy Info. Admin., *Annual Electric Generator Report, Form EIA-860*, file 3_3_Solar_Y2025.xlsx, sheet "Operable" (2025), https://tinyurl.com/3z92pt7n (DC net capacity of West Virginia's utility-scale solar units: Blake 99.9 MW; Fort Martin 23.04 MW; Marlowe 8 MW; Rivesville 6.36 MW; Capon Bridge 26.34 MW; Ravenswood 130.1 MW; total 293.74 MW).

[33] U.S. Energy Info. Admin., *Form EIA-923, Detailed Data with Previous Form Data (EIA-906/920)*, file EIA923_Schedules_2_3_4_5_M_12_2025_Final.xlsx, sheet "Page 1

80,000 MWh in 2025, West Virginia produced roughly 313,000 MWh of solar energy that year. Both figures are growing.

73. West Virginia's harms from New Jersey's trade restrictions are growing sharply. Until 2024, West Virginia had no operating utility-scale solar facilities at all.[34] But after the West Virginia Legislature enacted Senate Bill 583 in 2020, each of the State's electric utilities is

---

Generation and Fuel Data" (2025), https://tinyurl.com/2sjwvfys (net generation for West Virginia solar plants: Blake 158,086 MWh; Fort Martin 25,369 MWh; Marlowe 7,776 MWh; Rivesville 7,928 MWh; Capon Bridge 33,955 MWh; Ravenswood 315 MWh (first generation in November 2025); total 233,429 MWh); U.S. Energy Info. Admin., *Form EIA-861M (Formerly EIA-826) Detailed Data, Small Scale PV Estimate*, file small_scale_solar_2025.xlsx, sheet "Monthly Totals- States" (2025), https://tinyurl.com/ms4wpcve (West Virginia small-scale solar generation of approximately 80,000 MWh in 2025; combined with utility-scale generation, approximately 313,000 MWh); *see also* U.S. Energy Info. Admin., *Form EIA-923, Detailed Data with Previous Form Data (EIA-906/920)*, file EIA923_Schedules_2_3_4_5_M_12_2024_Final.xlsx, sheet "Page 1 Generation and Fuel Data" (2024), https://tinyurl.com/2sjwvfys (West Virginia utility-scale solar net generation of about 186,000 MWh in 2024); U.S. Energy Info. Admin., *Form EIA-861M (Formerly EIA-826) Detailed Data*, *Small Scale PV Estimate*, file small_scale_solar_2024.xlsx, sheet "Monthly Totals-States" (2024) (West Virginia small-scale solar generation of 61,038 MWh in 2024).

[34] U.S. Energy Info. Admin., *Form EIA-860*, file 3_3_Solar_Y2025.xlsx, *supra* note 32 (listing operating dates for all West Virginia utility-scale solar units, the earliest of which entered service in January 2024; no West Virginia units appear among retired or canceled units).

now authorized to develop up to 200 megawatts of utility-scale solar.[35] And, between January 2024 and November 2025, six utility-scale solar facilities entered service in West Virginia, bringing the State's utility-scale fleet to about 294 MW (direct current) in less than two years.

74. West Virginia's utilities have proposed additional utility-scale solar,[36] and the Solar Energy Industries Association projects 1.2 GW of additional installations over the next five years.[37] EIA data show 140.4 MW-ac of utility-scale solar reaching commercial operation in West Virginia in 2024, with 118.9 MW-ac added in 2025, and nearly 1,000 MW-ac of merchant projects hold executed interconnection agreements or are in PJM's advanced study stages.[38]

---

[35] S.B. 583, 2020 Leg., Reg. Sess. (W. Va. 2020) (codified at W. VA. CODE § 24-2-1o (2020)).

[36] *See* Mon Power & Potomac Edison, *CPCN and Siting Certificate Filing* (Feb. 13, 2026) (70 MW of utility-scale solar at three West Virginia sites), https://tinyurl.com/3jtjyy5s.

[37] Solar Energy Industries Association (SEIA), *West Virginia Solar State Spotlight* 1, https://tinyurl.com/zthafj37.

[38] U.S. Energy Info. Admin., *Form EIA-860*, file 3_3_Solar_Y2025.xlsx, *supra* note 32 (West Virginia utility-scale units reaching commercial operation: 140.4 MW-ac in 2024 and 118.9 MW-ac in 2025); *id.*, *Form EIA-860, Schedule 3: Solar Technology Data (Operable Units Only) (2024)*, https://tinyurl.com/3z92pt7n; *id.*, *Form EIA-860M, Schedule 3: Solar Technology Data (Operable Units Only) (2026)*, https://tinyurl.com/3z92pt7n.

75. According to BPU data, CSI solar credit contracts were awarded to only 12 New Jersey solar projects in the BPU's June 2026 solicitation, with contract prices ranging from $81.45 to $135 per MWh, accounting for roughly 238 MW of solar generation capacity.[39] The CSI bidding program "aims to award incentives for 300 MW of new solar generation annually."[40]

76. Without access to New Jersey's CSI market, West Virginia's solar producers have realized little for their credits. Most have been sold outside any state compliance program, at voluntary-market prices of roughly $2 to $8 per MWh, driven by consumers who choose to procure renewable electricity beyond what policy requires.[41]

77. For each solar credit that New Jersey's location rule keeps out of its market, the economic harm to West Virginia can be roughly estimated by taking the difference between what New Jersey's program pays for that credit and what the same credit could sell for in the voluntary market. The estimate therefore turns on three questions: (1)

---

[39] *Fourth Solicitation Order*, *supra* note 4, at 7–8.

[40] *Id.* at 2.

[41] Steve Marcou, *Renewable Energy Credits: Your Complete 2025 Guide to RECs, Pricing, and Environmental Impact*, Solar Tech (May 20, 2026), https://tinyurl.com/uezmkn48.

how many credits West Virginia would sell into New Jersey if the market were open; (2) what New Jersey pays per credit; and (3) what those credits earn elsewhere.

78. Figure 1 shows the price gap, and Table 1 summarizes the results of the estimates, described in more detail below.

**Figure 1. What one solar credit earns in New Jersey versus the voluntary market ($ per MWh)**




**Table 1. Summary of West Virginia's estimated harm**

| Category | Period | Harm |
|---|---|---|
| New projects shut out of New Jersey's auctions (SREC-II) | 2027–2031 | Approximately $140–$152 million |
| Operating plants excluded while eligible (SREC-II) | 2027–2031 | Approximately $128–$138 million |
| Legacy systems, future (SREC) | 2027–2033 | More than $6 million |

| Category | Period | Harm |
|---|---|---|
| Past exclusion (SREC and TREC) | 2018–2025 | Approximately $20–$22 million |
| State treasury (income tax on new-project revenue) | 2027–2031 | Approximately $6.4–$7 million |

### 1. *Estimated Fiscal Harm Caused by SREC-II*

79. **New Jersey Demand**. Under SREC-II, New Jersey seeks 300 MW of new solar each year.[42] Historically, however, New Jersey's own bidders have failed to meet that target. Across four solicitations, New Jersey sought about 1,200 MW of new solar, but New Jersey's bidders filled only about 572 MW of it.[43] This means that roughly half of New Jersey's demand—628 MW total, averaging about 157 MW each year—has gone unfilled. If this trend continues, it will amount to about 785 MW of unmet solar demand over the next five years.

---

[42] *See Fourth Solicitation Order*, *supra* note 4, at 2.

[43] *See* N.J. Bd. Pub. Utils., *Order on the Outcome of the Second Solicitation in the CSI Program*, Dkt. No. QO21101186, at 4–7 (Apr. 17, 2024), https://tinyurl.com/3ppf854s (first solicitation: no awards; second solicitation: 310.2 MW awarded); N.J. Bd. Pub. Utils., *Order on the Outcome of the Third Solicitation in the CSI Program*, Dkt. No. QO21101186, at 4, 6 (Mar. 4, 2026), https://tinyurl.com/bd6a4nb9 (24.1 MW awarded); *Fourth Solicitation Order*, *supra* note 4, at 4–5, 7–8 (238.0 MW awarded).

80. **West Virginia Supply**. West Virginia is projected to have 1.2 GW of new solar installations over the next five years.[44] Most of the capacity would be eligible for sale on the CSI market if not for New Jersey's restrictions. About 81% of West Virginia's solar capacity comes from grid-supply projects or net-metered projects with a capacity over 5 MW—the kind CSI rewards.[45] If new capacity follows that same pattern, West Virginia will have around 970 MW of new CSI-eligible solar installations over the next five years—more than enough to meet New Jersey's outstanding solar demand under the CSI program.

81. Each MW of new solar power produces about 1,237 MWh per year—and therefore about 1,237 credits.[46] If West Virginia's projected

---

[44] *See* SEIA, *supra* note 37, at 1.

[45] West Virginia has about 259 MW-ac of solar capacity in units larger than 5 MW. *See* U.S. Energy Info. Admin., *Form EIA-860*, file 3_3_Solar_Y2025.xlsx, *supra* note 32. Five units, totaling about 146 MW-ac, report no net-metering agreement and are grid supply; the sixth, about 113 MW-ac, is a non-residential net-metered facility with a capacity greater than 5 MW. *See id.*

West Virginia also has about 62 MW-ac of solar capacity in smaller systems less than 1 MW-ac in size. *See* U.S. Energy Info. Admin., *Form EIA-861M,* file small_scale_solar_2025.xlsx, *supra* note 33 (Dec. 2025 data). Accordingly, about 81% of West Virginia's solar capacity reported by the EIA is in the form of grid-supply facilities or non-residential net-metered facilities with a capacity of more than 5 MW.

[46] *See* PJM Env't Info. Servs., Inc., *New Jersey Solar Performance Analysis* 3, 5 (Feb. 1, 2019) (New Jersey solar systems larger than 1 MW

new projects were allowed to fill New Jersey's estimated unmet solar demand of about 157 MW in each solicitation from 2027 on, producing from the year after award, they would produce about 1.94 million credits through 2031.[47]

82. **Credit Value**. Each credit is valued at the average price New Jersey awarded in June 2026 for projects of 20 MW or more—$88.94 per MWh—held for the life of the award. To be conservative, the estimate assumes that price falls 5% every year—to $84.49 for awards made in 2027 and $68.82 for awards made in 2031—consistent with the Board's stated intent to reduce incentives.

83. From that price, the estimate subtracts (1) what the same credit could already earn in the voluntary market ($2–$8 per MWh) and (2) the Board's small annual administration fee ($100 per MW, or about

---

produced an average of 1,237 MWh per MW of installed capacity per year over energy years 2014–2018), *reprinted in* N.J. Bd. Pub. Utils., *New Jersey Solar Transition: Transition Incentive Staff Straw Proposal* 74, 76 (Sept. 4, 2019), https://tinyurl.com/59rxxnmd.

[47] This estimate assumes West Virginia projects fill about 157 MW of New Jersey's unmet solar demand each year—the average unfilled amount across the first four CSI solicitations. At 1,237 credits per MW per year, that capacity would produce about 194,000 credits in 2028, 388,000 in 2029, 582,000 in 2030, and 776,000 in 2031, for a total of about 1.94 million credits.

$0.08 per credit). The result is that, absent the geographic restrictions, West Virginia generators would see a net value ranging from about $76.41–$82.41 per MWh for projects awarded in 2027 to about $64.36–$70.36 per MWh for projects awarded in 2030, the last awards that produce credits before 2032.[48]

84. **Total Estimated Economic Harm**. Multiplying the roughly 1.94 million credits that West Virginia's new solar projects could supply to New Jersey's CSI program from 2027 through 2031 by their net value—assuming a price reduction of 5% per year, with each year's awards held at that year's price—yields about $140 to $152 million.

85. **Harm to Existing Plants Under SREC-II**. Separately, three West Virginia solar plants now in operation—Blake (99.9 MWdc), Ravenswood (130.1 MWdc), and Capon Bridge (26.34 MWdc)—were still under development during at least one of New Jersey's 2024 to 2026 solicitations, and the location rule barred each from registering. Because CSI admission is limited to new projects, these plants cannot bid now. If they were admitted retroactively at the same $88.94 average price, they

[48] *See Fourth Solicitation Order*, *supra* note 4, at 7–8, 9–10, 13 (award table and $100 per MW annual administration fee); Marcou, *supra* note 41.

would earn about $128 to $138 million from 2027 through 2031.[49] This figure is separate from, and not added to, the new-project figure above.

*2. Estimated Fiscal Harm Caused by SREC and TREC*

86. New Jersey's now-closed SREC program still allows credit purchases through 2033 for legacy generators. About 10 MW of West Virginia systems were installed before New Jersey closed legacy registration on April 30, 2020, and they would have held qualification lives of fifteen years if registered before October 29, 2018, and ten years if registered on or after that date. Valuing their remaining eligible output, at 15- and 10-year cohorts respectively, at the Board's own forecasting price, net of the voluntary-market value, these systems will lose more than $6 million from 2027 through 2033.[50]

---

[49] U.S. Energy Info. Admin., *Form EIA-860*, file 3_3_Solar_Y2025.xlsx, *supra* note 32 (Blake 99.9 MWdc; Ravenswood 130.1 MWdc; Capon Bridge 26.34 MWdc). Together, the three plants total 256.34 MWdc. At 1,237 credits per MWdc per year, *see supra* note 46, they would produce about 317,000 credits annually. Each credit's value of $88.94, less the $2–$8 voluntary market price and the Board's $100 per MW annual fee (about $0.08 per credit), yields a net value of about $80.86–$86.86. CSI awards pay a fixed price over a project's qualification life, so the price is held constant from 2027 through 2031. *See* N.J. ADMIN. CODE § 14:8-11.6(a), (c), (i). Thus, 317,000 credits × $80.86–$86.86 × 5 years (2027–2031) ≈ $128–$138 million.

[50] *U.S. Energy Info. Admin., Form EIA-861M (Formerly EIA-826) Detailed Data, Small Scale PV Estimate*, files for 2014 through 2020,

87. The same legacy-eligible systems also lost $17 to $19 million from 2018 through 2025. Adding systems installed during New Jersey's 2020–2021 transition (TREC) program (valued at that program's lowest factor, $91.20 per MWh) brings West Virginia's past losses to $20 to $22 million.[51]

---

sheet "Monthly Totals- States," https://tinyurl.com/ms4wpcve (West Virginia small-scale capacity by month; 9.854 MW on April 30, 2020); N.J. Bd. Pub. Utils., Order of Feb. 27, 2019, Dkt. No. QO18070698, https://tinyurl.com/y4adbnt3 (15-year qualification life for complete registrations submitted before midnight October 29, 2018; 10 years thereafter); N.J. Bd. Pub. Utils., Order of May 21, 2026, Dkt. No. QO24020126, at 11, https://tinyurl.com/yc7fxm5c (forecasting price of 93 percent of the Solar Alternative Compliance Payment); *EY 24 RPS Compliance Results 2004 to 2024*, *supra* note 4 (compliance payment schedule, $188 in energy year 2027 declining to $128 in 2033).

West Virginia had about 9.85 MW of small-scale solar when New Jersey closed its SREC program in April 2020, installed in cohorts from before 2014 through April 2020. Applying each cohort's qualification life, those systems' eligible output falls from about 10,600 MWh in 2027 to about 2,400 MWh in 2032 and ends before 2033, about 41,500 credits in all. Valued at the Board's forecasting price, $174.84 per credit in energy year 2027 falling to $128.34 in 2032, those credits are worth about $6.6 million; net of the $2–$8 each could earn on the voluntary market (about $0.08–$0.33 million in total), they are worth about $6.3 million to $6.5 million. *See* U.S. Energy Info. Admin., *Form EIA-861M* (Formerly EIA-826) Detailed Data, *Small Scale PV Estimate*, file small_scale_solar_2020.xlsx, sheet "Monthly Totals- States" (2020), https://tinyurl.com/ms4wpcve; Marcou, *supra* note 41 ($2–$8 price for voluntary market).

[51] U.S. Energy Info. Admin., *Form EIA-861M (Formerly EIA-826) Detailed Data, Small Scale PV Estimates*, files for 2018 through 2021, sheet "Monthly Totals- States," https://tinyurl.com/ms4wpcve; N.J. Clean

*3. Estimated Harm to West Virginia Ratepayers*

88. West Virginia is a fully regulated, vertically integrated electricity market; its electric utilities recover the cost of their solar facilities from customers through rates approved by the West Virginia Public Service Commission, net of any payments from customers who purchase that solar output directly. This means that when its utilities sell renewable energy credits, the proceeds are credited back to customers through docketed rate mechanisms.[52] Revenue those facilities

---

Energy Program, SREC Pricing (monthly average SREC prices of $184.71 to $211.58 from December 2018 to December 2025), https://tinyurl.com/wwhbxycr; N.J. ADMIN. CODE § 14:8-10.5(a)-(c) (TRECs from net-metered solar priced at 0.6 × $152 = $91.20 over a 15-year qualification life). West Virginia's legacy-eligible solar grew from about 5.9 MW in January 2018 to about 9.85 MW when New Jersey closed its SREC program in April 2020. Counting that capacity as it came online, it would have produced about 90,800 SRECs from 2018 to 2025 (at 1,237 MWh per MW each year), worth about $16.8 million at the low-end price of $184.71 and about $19.2 million at the high-end price of $211.58. Between the closure of the SREC program in April 2020 and the closure of the transition program in August 2021, West Virginia added about 5 MW of small-scale solar. Counting those systems as they came online, they would have produced about 32,900 TRECs from 2020 to 2025, worth about $3.0 million at $91.20 each. Together, the past losses total about $19.8 million to $22.2 million.

[52] *See* Comm'n Order, *Appalachian Power Co.*, Case No. 23-0328-E-PC, at 3, 6 (W. Va. Pub. Serv. Comm'n Dec. 1, 2023) (proceeds from RECs sold by APCo offset cost of service); Comm'n Order, *Monongahela Power Co.*, at 56 (W. Va. Pub. Serv. Comm'n Nov. 22, 2011) (Mon Power and Potomac Edison must use credits in the manner that provides the most benefit to

could earn by selling credits into New Jersey's market would reduce the costs left for West Virginia ratepayers to cover, resulting in lower energy bills for West Virginia ratepayers.

89. Under West Virginia Code § 24-2-1*o*, Mon Power sells solar power and solar credits to subscribing West Virginia customers from three operating sites (Fort Martin, Marlowe, and Rivesville) and two planned sites (Wylie Ridge and Davis), and it recovers the cost of unsubscribed output through a surcharge on all customers. Credits sold to subscribers are retired on their behalf, but credits from unsubscribed output could be sold. Because New Jersey's location rule bars those credits as well, it forecloses revenue that would lower the surcharge borne by West Virginia customers.[53] The result is that West Virginia ratepayers' bills are higher because New Jersey's credit markets are closed.

---

West Virginia retail customers); American Municipal Power, *Generation*, https://www.amppartners.org/generation/ (last visited Nov. 6, 2026) (RECs sold by AMP "reduce its wholesale power costs").

[53] *See supra* note 52.

#### *4. Estimated State Fiscal Harm*

90. West Virginia's treasury will also lose income tax on the missed credit revenue. New projects are typically owned by single-asset companies that do business only in West Virginia, and credits cost nothing extra to produce, so credit revenue is essentially West Virginia net income.

91. Applying the State's top individual and pass-through tax rate (4.58%) to the approximately $140.4–$152.1 million in new-project revenue yields $6.43–$6.97 million in lost tax. Actual collections will depend on each owner's tax situation, so this figure is an estimate.[54]

### G. The Harm Is Ongoing and Multiplying Every Year

92. The BPU conducts its CSI solicitation once a year. Under the schedule the BPU adopted in April 2025, the fifth solicitation is expected to open in early 2027, with the registration window closing in the spring and awards issued by mid-year. A facility that has not qualified when the window closes cannot participate in that solicitation.[55]

---

[54] W. VA. CODE §§ 11-24-4, 11-21-4j, 11-24-7. The estimate is $140.4–$152.1 million × 4.58% ≈ $6.43–$6.97 million; at the 6.5% corporate net income tax rate, it would be about $9.1–$9.9 million.

[55] N.J. Bd. Pub. Utils., *Price Cap Determination for the Third Solicitation of the CSI Program*, Dkt. No. QO21101186, at 11 (Apr. 23, 2025),

93. Critically, each award is fixed for fifteen years. A project excluded from a solicitation cannot receive anything for that round, and it cannot participate retroactively. The roughly 157 MW a year that New Jersey's own bidders have left unfilled would, at the price New Jersey paid in June 2026, produce about 194,000 credits a year worth about $17 million a year, and about $259 million over the fifteen-year term of a single round's awards. Every solicitation that closes with the location rule in place forecloses an opportunity of that size permanently.[56]

94. The legacy program runs on the same kind of clock. New Jersey's energy year runs from June 1 to May 31, and the BPU settles each year's compliance in the months that follow; energy year 2027 began on June 1, 2026, and the Solar Alternative Compliance Payment that caps its price is $188. A supplier's obligation for an energy year, once settled, is never reopened, and the certificates that could have met it are never bought. Every energy year that closes with registration shut to out-

https://tinyurl.com/rnh5s5db; *Fourth Solicitation Order*, *supra* note 4, at 2.

[56] N.J. ADMIN. CODE § 14:8-11.6(a), (c), (i); *Fourth Solicitation Order*, *supra* note 4, at 7–8, 12 (156.9 MW × 1,237 credits per MW × $88.94 × 15 years ≈ $259 million).

of-state systems is a year of sales lost permanently, and the obligation ends with energy year 2033.[57]

95. The supply New Jersey excludes is large enough to matter. In the six states and the District of Columbia that lie wholly within PJM, other than New Jersey, about 1,240 MW of utility-scale solar and about 1,630 MW of small-scale solar were in service before April 30, 2020, together about 2.9 GW producing roughly 3.6 million credits a year, before counting the PJM portions of Illinois, North Carolina, Kentucky, Michigan, and Indiana. New Jersey's legacy obligation is about 3.3 million credits a year, and its suppliers paid $252 million in compliance payments over three energy years because New Jersey's own systems could not supply it. Opening the program would supply that shortfall and reduce what New Jersey's own ratepayers pay.[58]

---

[57] N.J. STAT. ANN. § 48:3-87(d)(3); N.J. ADMIN. CODE § 14:8-2.11 (compliance filing deadline); *EY 24* RPS Compliance *Results 2004* to *2024*, *supra* note 4.

[58] U.S. Energy Info. Admin., *Annual Electric Generator Report, Form EIA-860*, file 3_3_Solar_Y2024.xlsx, sheet "Operable" (2024) (operable solar units by operating date for Pennsylvania, Maryland, Delaware, the District of Columbia, Virginia, West Virginia, and Ohio); U.S. Energy Info. Admin., *Form EIA-861M*, file small_scale_solar_2020.xlsx, *supra* note 50 (Apr. 2020 data, same jurisdictions); *EY 24 RPS Compliance Results 2004 to 2024*, *supra* note 4.

### H. New Jersey Ratepayers Are Directly Harmed

96. New Jersey ratepayers also bear the cost of the State's protectionism. New Jersey's four electric distribution companies—Atlantic City Electric, Jersey Central Power & Light, Public Service Electric and Gas, and Rockland Electric—pay for every SREC-II produced under the CSI program, each in proportion to its share of retail electricity sales, and they recover those costs directly from customers through surcharges on their electric bills.[59]

97. By barring out-of-state solar from competing for CSI awards, New Jersey ensures that those customers pay more than necessary. In the BPU's June 2026 solicitation, winning bids ranged from $81.45 to $135 per credit, with capacity-weighted averages of $88.94 per credit for projects of 20 MW or more and $105.74 per credit for smaller projects.[60] Competition from the rest of PJM would inevitably push these prices down, and cost savings would be passed on to ratepayers. Thus, New

[59] N.J. Bd. Pub. Utils., *Order Launching the CSI Program*, Dkt. No. QO21101186, at 45 (Dec. 7, 2022), https://tinyurl.com/4z9uf9z9 (ordering the EDCs' administrator to "purchase all SREC-IIs produced each year by eligible projects for the CSI Program" and allowing the EDCs to recover those costs "based on each EDC's proportionate share of retail electric sales").

[60] *See Fourth Solicitation Order*, *supra* note 4, at 7–8.

Jersey's refusal to open its borders to interstate competition for its solar credits results in increased ratepayer costs.

98. New Jersey law confirms that its ratepayers bear these costs under both the legacy and successor programs. The statute expressly requires SREC-II costs to be allocated to ratepayers: "The costs of the SREC-II program shall be apportioned to ratepayers using a methodology approved by the board." N.J. STAT. ANN. § 48:3-115(e).

99. The BPU has likewise acknowledged, with respect to legacy solar compliance costs, that "[t]he cost of the SRECs . . . are included in the all-in cost of electricity borne by ratepayers throughout the State."[61] And in September 2026, the BPU approved an increase in Atlantic City Electric's SuSI charge from $0.001155 per kWh to $0.002443 per kWh, directly raising customer bills.[62] Whether embedded in supply rates (legacy SRECs) or recovered through regulated utility charges (SREC-IIs), the economic burden ultimately falls on New Jersey ratepayers.

---

[61] N.J. Bd. Pub. Utils., *2011 New Jersey Energy Master Plan* 92 (Dec. 6, 2011), https://tinyurl.com/369nkh52.

[62] N.J. Bd. Pub. Utils., *Decision and Order Approving Stipulation*, Dkt. No. ER25070444, at 8 (Sept. 24, 2026), https://tinyurl.com/3wunbr7f.

100. The BPU has also explicitly acknowledged that ratepayers benefit from an energy credit market that is open to interstate competition. It has noted that allowing the purchase of out-of-state energy credits can result in "lower ratepayer cost"—but it argues that such competition results in "fewer economic benefits . . . directly to New Jersey."[63]

101. These costs come amid what New Jersey itself has declared an "electricity affordability crisis."[64] The BPU has acknowledged that "reducing the cost of solar incentives to ratepayers over time is an important policy goal."[65] Yet New Jersey continues to restrict the very competition that would lower those costs—all to benefit in-state solar companies.

### I. New Jersey's Programs Impose Burdens Clearly Excessive in Relation to Any Legitimate Local Interest

102. Even if New Jersey's solar geographic restrictions were not facially discriminatory, they would still fail the *Pike* balancing test because the burdens they impose on interstate commerce are clearly

---

[63] N.J. Bd. Pub. Utils., *2019 N.J. Energy Master Plan*, *supra* note 1, at 104.

[64] *See Fourth Solicitation Order*, *supra* note 4, at 4.

[65] *Id.* at 10.

excessive in relation to any putative local benefits. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). New Jersey has nondiscriminatory alternatives available that would achieve any legitimate environmental or economic objective without burdening interstate commerce.

103. The geographic restrictions serve a purely economic purpose: channeling solar investment and jobs to New Jersey at the expense of out-of-state competitors. That is precisely the kind of economic protectionism the Commerce Clause forbids. *See Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978).

104. Moreover, New Jersey has nondiscriminatory alternatives available. It could achieve the same purported environmental benefits, while helping its own ratepayers, if it allowed out-of-state competition in bidding for its CSI program.

105. Those ratepayers now bear the cost of the exclusion: They pay CSI award prices of $81.45 to $135 per credit and roughly $200 per credit for legacy SRECs, amid what New Jersey itself calls an "electricity affordability crisis"—prices that competition from the rest of PJM would drive down.

## CAUSES OF ACTION

### Count I – Violation of the Dormant Commerce Clause

*SuSI/SREC-II*

106. West Virginia re-alleges the facts above and incorporates them herein by reference.

107. The Dormant Commerce Clause prohibits state laws that discriminate against out-of-state commerce. *Philadelphia*, 437 U.S. at 624. A discriminatory law is "virtually *per se* invalid." *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994).

108. Wholesale electricity flows between states are quintessentially interstate commerce. *See Transource Pa., LLC v. DeFrank*, 156 F.4th 351, 358 (3d Cir. 2025).

109. New Jersey's SuSI/SREC-II program is facially discriminatory. The ADI track requires connection to systems "owned or operated by a New Jersey electric distribution company" or "by a New Jersey municipal electric utility." N.J. ADMIN. CODE § 14:8-11.4(e). The CSI track requires interconnection "to a distribution or transmission system operated by a New Jersey electric public utility or local government unit." N.J. ADMIN. CODE § 14:8-11.4(k). Both tracks, on their

face and as interpreted and implemented by the BPU, exclude otherwise eligible out-of-state PJM solar resources from New Jersey's solar incentive market.

110. Even if the challenged program were not facially discriminatory, it would violate the Commerce Clause because it was enacted and implemented for a discriminatory purpose and has a discriminatory practical effect.

111. The BPU has described its solar programs as "establishing carve-outs for in-state solar and offshore wind through 2035," and it has argued against allowing interstate competition on the basis that doing so would bring "fewer economic benefits . . . directly to New Jersey."[66] The geographic restrictions were designed to promote in-state solar development at the expense of out-of-state competition.

112. The challenged program also fails the *Pike* balancing test, which holds that a state law imposing burdens on interstate commerce that are "clearly excessive in relation to the putative local benefits" violates the Commerce Clause. *Pike,* 397 U.S. at 142.

---

[66] N.J. Bd. Pub. Utils., *2019 N.J. Energy Master Plan*, *supra* note 1, at 101, 104.

113. The program imposes a severe burden on interstate commerce by excluding otherwise eligible out-of-state solar resources from New Jersey's solar credit markets. It blocks West Virginia solar resources from a market where CSI credits were awarded at average prices of approximately $88.94 to $105.74 per MWh in June 2026, leaving them to the voluntary market, where credits earn roughly $2–$8 per MWh.

114. The burden is substantial. West Virginia generators, ratepayers, and the State treasury face significant lost revenues, lost ratepayer savings, and lost tax receipts because New Jersey's programs foreclose interstate solar renewable energy credit transactions that would otherwise occur throughout the PJM region. New Jersey's programs bar West Virginia's new projects from competing for approximately $140 million to $152 million in net revenue in the successor program; West Virginia's excluded operating plants could separately earn $128 million to $138 million if admitted; and legacy-eligible West Virginia systems will lose more than $6 million through 2033.

115. The putative local benefits are minimal or nonexistent. New Jersey's solar geographic restrictions do not create materially greater

environmental benefits than would be achieved by allowing otherwise eligible out-of-state PJM resources to participate on equal terms. Instead, the programs protect in-state generators from interstate competition and increase costs for New Jersey ratepayers, who fund every SREC-II through surcharges on their electric bills at CSI award prices of $81.45 to $135 per credit that competition from the rest of PJM would drive down. And New Jersey has available nondiscriminatory alternatives—including direct grants and rebate-based incentives—that would achieve any legitimate local objective without burdening interstate commerce.

116. Absent an injunction, New Jersey's programs will continue to inflict irreparable harm on West Virginia's energy producers, ratepayers, and treasury by excluding them from New Jersey's solar credit markets in violation of the Commerce Clause. And, for the reasons above, after the next solicitation and close of the current energy year, each loss will be permanent and unrecoverable.

**Count II – Violation of the Dormant Commerce Clause**

*SREC*

117. West Virginia re-alleges the facts above and incorporates them herein by reference.

118. The Dormant Commerce Clause prohibits state laws that discriminate against out-of-state commerce. *Philadelphia*, 437 U.S. at 624. A discriminatory law is "virtually *per se* invalid." *Or. Waste Sys.*, 511 U.S. at 99.

119. Wholesale electricity flows between states are quintessentially interstate commerce. *Transource Pa.*, 156 F.4th at 358.

120. New Jersey's SREC program is facially discriminatory. The program requires solar facilities that sell energy or credits to electricity suppliers to be "connected to the distribution system in New Jersey" to qualify to produce SRECs. N.J. ADMIN. CODE §§ 14:8-2.2, 14:8-2.9(e)(1). A solar facility located in West Virginia cannot satisfy the "connected to the distribution system in New Jersey" requirement, *see* N.J. STAT. ANN. § 48:3-51, even though the West Virginia facility delivers electricity onto the same PJM grid and produces the same environmental attributes.

121. Registration in the SREC program closed to all applicants on April 30, 2020. A West Virginia facility's application before that date would have been futile, because New Jersey Administrative Code §§ 14:8-2.2 and 14:8-2.9(e)(1) excluded it on their face, and no facility outside New Jersey has ever been registered.

122. The closure of registration did not end the discrimination. New Jersey Statutes Annotated § 48:3-87(d)(3) re-imposes the solar purchase obligation on every electricity supplier serving New Jersey in each energy year through energy year 2033, declining from 4.35 percent of retail sales in energy year 2027 to 1.10 percent in energy year 2033, and the Board enforces that obligation each year through the Solar Alternative Compliance Payment. Each year's obligation compels purchases from a class of generators defined by their location inside New Jersey. The violation is therefore continuing.[67]

123. The Board has the authority to register a facility outside the ordinary registration window and has exercised comparable authority by waiver in its other solar programs. Registration of otherwise eligible out-of-state facilities placed in service before April 30, 2020, for the qualification life each would have held had it been registered when first eligible, would place them on the same terms as the New Jersey facilities registered under the program.[68]

---

[67] N.J. STAT. ANN. § 48:3-87(d)(3); N.J. Bd. Pub. Utils., *EY 24 RPS Compliance Results 2004 to 2024, supra* note 4 (schedule and compliance payments).

[68] *See, e.g.*, N.J. Bd. Pub. Utils., *Order Waiving ADI Program Eligibility Rules*, Dkt. Nos. QW22030128 et al. (Apr. 6, 2022),

124. Even if the challenged program were not facially discriminatory, it would violate the Commerce Clause because it was enacted and implemented for a discriminatory purpose and has a discriminatory practical effect.

125. As alleged above, the geographic restrictions were designed and implemented to promote in-state solar development at the expense of out-of-state competition. *See supra* ¶¶ 61–70.

126. The challenged program also fails the *Pike* balancing test, which holds that a state law imposing burdens on interstate commerce that are "clearly excessive in relation to the putative local benefits" violates the Commerce Clause. *Pike*, 397 U.S. at 142.

127. The program imposes a severe burden on interstate commerce by excluding otherwise eligible out-of-state solar resources from New Jersey's solar credit markets.

---

https://tinyurl.com/59rwhbce; N.J. Bd. Pub. Utils., *Order Waiving ADI Program Eligibility Rules*, Dkt. Nos. QW22030128 et al. (Feb. 14, 2024), https://tinyurl.com/2k97mvmh; N.J. Bd. Pub. Utils., *Order Allowing Certain ADI Projects to Begin Construction Prior to Receiving Conditional Registration*, Dkt. No. QO20020184 (Aug. 13, 2025), https://tinyurl.com/wvj8m96w (waivers of registration-timing requirements in the ADI program).

128. The burden is substantial. West Virginia generators, ratepayers, and the State treasury face significant lost revenues, lost ratepayer savings, and lost tax receipts because New Jersey's programs foreclose interstate solar renewable energy credit transactions that would otherwise occur throughout the PJM region. Legacy-eligible West Virginia systems will lose more than $6 million through 2033, on top of the approximately $20 million to $22 million already lost from 2018 through 2025.

129. The putative local benefits are minimal or nonexistent. New Jersey's solar geographic restrictions do not create materially greater environmental benefits than would be achieved by allowing otherwise eligible out-of-state PJM resources to participate on equal terms. Instead, the programs protect in-state generators from interstate competition and increase costs for New Jersey ratepayers, who bear the cost of legacy SRECs in the all-in cost of their electricity at prices of roughly $200 per credit. Competition from the rest of PJM would drive down those prices. And New Jersey has available nondiscriminatory alternatives—including direct grants and rebate-based incentives—that would achieve any legitimate local objective without burdening interstate commerce.

130. Absent an injunction, New Jersey's programs will continue to inflict irreparable harm on West Virginia's energy producers, ratepayers, and treasury by excluding them from New Jersey's solar credit markets in violation of the Commerce Clause.

**Count III – Violation of the Dormant Commerce Clause**

*TREC*

131. West Virginia re-alleges the facts above and incorporates them herein by reference.

132. The Dormant Commerce Clause prohibits state laws that discriminate against out-of-state commerce. *Philadelphia,* 437 U.S. at 624. A discriminatory law is "virtually *per se* invalid." *Or. Waste Sys.*, 511 U.S. at 99.

133. Wholesale electricity flows between states are quintessentially interstate commerce. *Transource Pa.*, 156 F.4th at 358.

134. New Jersey's TREC program is facially discriminatory. TRECs carried substantially the same geographic eligibility requirements as SRECs, i.e., requiring connection to New Jersey's distribution system. *See* N.J. ADMIN. CODE § 14:8-10.3(b)-(c).

135. Registration in the TREC program closed to all applicants on August 27, 2021. A West Virginia facility's application would have been futile because New Jersey Administrative Code §§ 14:8-10.3(b) and (c) excluded it on their face. Transition certificates issued under the program continue to be purchased for compliance for the fifteen-year qualification life of each registered facility, so the exclusion of out-of-state facilities placed in service between May 1, 2020, and August 27, 2021, is a continuing one.

136. Even if the challenged program were not facially discriminatory, it would violate the Commerce Clause because it was enacted and implemented for a discriminatory purpose and has a discriminatory practical effect.

137. As alleged above, the geographic restrictions were designed and implemented to promote in-state solar development at the expense of out-of-state competition. *See supra* ¶¶ 61–70.

138. The challenged program also fails the *Pike* balancing test, which holds that a state law imposing burdens on interstate commerce that are "clearly excessive in relation to the putative local benefits" violates the Commerce Clause. *Pike*, 397 U.S. at 142.

139. The program imposes a severe burden on interstate commerce by excluding otherwise eligible out-of-state solar resources from New Jersey's solar credit markets. It blocked West Virginia solar resources from the transition market, and the certificates issued under it continue to be purchased for compliance.

140. The burden is substantial. West Virginia generators, ratepayers, and the State treasury face significant lost revenues, lost ratepayer savings, and lost tax receipts because New Jersey's programs foreclose interstate solar renewable energy credit transactions that would otherwise occur throughout the PJM region.

141. The putative local benefits are minimal or nonexistent. New Jersey's solar geographic restrictions do not create materially greater environmental benefits than would be achieved by allowing otherwise eligible out-of-state PJM resources to participate on equal terms. Instead, the programs protect in-state generators from interstate competition and increase costs for New Jersey ratepayers, who bear the cost of the transition certificates purchased for compliance at prices that competition from the rest of PJM would drive down. And New Jersey has available nondiscriminatory alternatives—including direct grants and

rebate-based incentives—that would achieve any legitimate local objective without burdening interstate commerce.

142. Absent an injunction, New Jersey's programs will continue to inflict irreparable harm on West Virginia's energy producers, ratepayers, and treasury by excluding them from New Jersey's solar credit markets in violation of the Commerce Clause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of the State of West Virginia and against Defendants, and grant the following relief:

1. Declare that the geographic eligibility restrictions imposed by New Jersey's SuSI/SREC-II program, codified in N.J. ADMIN. CODE § 14:8-11.4(e), § 14:8-11.4(k), and N.J. STAT. ANN. § 48:3-119(a), and the geographic eligibility restrictions imposed by the SREC and TREC programs, codified in N.J. ADMIN. CODE § 14:8-2.2, § 14:8-2.9(e)(1), and § 14:8-10.3(b)–(c), as applied to solar photovoltaic resources and solar renewable energy certificates, violate the Commerce Clause of the United States Constitution to the extent they exclude otherwise eligible out-of-state PJM resources from New Jersey's solar incentive market based on location, physical connection, service-territory connection, or other in-state presence requirements;

2. Permanently enjoin Defendants, their officers, agents, servants, employees, successors, and all persons in active concert or participation with them from implementing or enforcing the geographic eligibility restrictions imposed by the SREC, TREC, and SuSI/SREC-II programs and the BPU's implementing regulations in a manner that excludes

otherwise eligible out-of-state PJM resources from participating in New Jersey's solar credit markets on equal terms with comparable New Jersey resources;

3. Order Defendants to recognize otherwise eligible out-of-state PJM resources as eligible to create, transfer, sell, and be used for compliance with New Jersey's solar renewable energy credit obligations on the same terms as comparable in-state resources, without regard to the resource's out-of-state location, out-of-state physical connection, or absence of New Jersey-specific interconnection, except to the extent a nondiscriminatory eligibility requirement applies equally to in-state and out-of-state resources;

4. Order Defendants to accept registration in the SREC program, notwithstanding the closure of registration on April 30, 2020, of otherwise eligible out-of-state PJM solar facilities placed in service before that date, and to accept registration in the TREC program of such facilities placed in service between May 1, 2020, and August 27, 2021, in each case for the qualification life the facility would have held had it been registered when first eligible, measured from that date, and to treat certificates from such facilities' generation on and after June 1, 2026, as eligible for compliance in energy year 2027 and subsequent energy years, acting on each registration within thirty days of its submission;

5. Order Defendants to conduct a remedial solicitation, or to accept registration, on the same terms as past solicitations, for otherwise eligible out-of-state PJM solar facilities that had not commenced commercial operation during any of those solicitations and were excluded from registration by the challenged restrictions, notwithstanding N.J. ADMIN. CODE § 14:8-11.4(i);

6. Award Plaintiff its costs and, to the extent authorized by law, attorneys' fees; and

7. Grant such other and further relief as the Court deems just and proper.

Dated: November 18, 2026

Mark I. Pinkert*
Steven A. LaRussa*
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC
2333 Ponce de Leon Blvd., Suite 600
Coral Gables, FL 33134
mpinkert@holtzmanvogel.com
(305) 379-1601

/s/ Brian D. Nieves
David P. Johnson*
Brian D. Nieves
(NJ Bar No. 384502022)
Peter M. Torstensen, Jr.*
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC
2300 N Street N.W.
Suite 643
Washington, DC 20037

John B. McCuskey
*Attorney General*

Zachary A. Viglianco*
*Director of Strategic Litigation*

Caleb B. David*
*Deputy Solicitor General*

OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
1900 Kanawha Blvd. E
WV State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305

*Counsel for the State of West Virginia*
**Pro hac vice* forthcoming